We'll move now to the next case on the calendar. United States of America v. Robert Acosta and Jose Diaz. And we have Mr. Eddy, who's arguing on behalf of Mr. Acosta. Can you see me, Your Honor? I seem to be having trouble. All right, you can hear me okay, but we can't see you. All right, I'm trying to... What I'm trying to hit is hidden under a couple of tabs here. All right, here we go. There you go. All right, much better. May it please the Court, my name is Thomas Eddy, and I represent the appellant Robert Acosta. As the Court will recall, this is a double homicide prosecuted 20 years after the murders on the basis of testimony, ever-shifting testimony of a paid but admittedly double-dealing confidential informant. It involves the theft of drug proceeds and two murders commissioned thereafter by my client that were carried out by the co-defendant, Jose Diaz, and an accomplice. I'd like to direct the Court's attention first to point two, which challenges two 848E1A convictions of intentional murder while engaged in a drug offense. The debate here is over the sufficiency of the evidence that the narcotics conspiracy that preceded the September 1997 theft continued on through the December 22, 1997 murders. And we believe that the debate is resolved by looking at the rule governing sufficiency cases, which is that the evidence must be viewed in its totality rather than in isolation. Considered in totality, we think that the only conclusion that the, excuse me, evidence permits is that the conspiracy ended with the September 1997 theft and another conspiracy picked up thereafter, but that there were indeed multiple conspiracies, one before the theft and one thereafter. You can see, Mr. Eddie, Mr. Tavares testified that he was working in the drug location on the night of the murder. Mr. Collado testified that he began working for Mr. Acosta's drug organization in the months after the murder. So you agree that was drug activity related to your client. You're just saying it's a different conspiracy. Is that what I heard you say? Well, I'd like to go in a little further to, you know, go delve into the evidence a little more closely to answer your question, your honor. So first Hinton discovers the burglary. He summons appellant who arrives with this supplier. They quickly conclude that it's an inside job. The two people with keys are Hinton, the supervisor, appellant's top lieutenant, and appellant himself. Immediately, instead of presenting at any sort of united front, immediately Hinton throws my client under the bus and tells the supplier that appellant had to have robbed himself because he didn't do the robbery. So already the things are falling apart. Then Hinton testifies. I mean, if you're going to look at testifies categorically that appellant abandoned the enterprise, that's his word, abandoned after the robbery, after the burglary. No other witness contradicted that. And nobody even suggested that that didn't. Collado contradicted that. All right. First of all, your honor, with respect to suppliers, Hinton saw suppliers in connection with two robberies. There was a preceding robbery at an Edgmont location, and then there was this burglary. He met the supplier both times because the supplier showed up to find out whether there was a real, you know, really was a robbery. That supplier is identified in the transcript as somebody named Cacone. Thereafter, when Collado gets into the conspiracy, a separate conspiracy, six months after the murders, he tries to set up appellant supplier at that point. Appellant is now named Moises. So there are two different suppliers. We don't know if if appellant was ever able to pay back. Collado testified that the murders were because appellant was obligated to pay back his supplier. We don't know that he ever. You're suggesting that even if you're dealing drugs in the same area with the same organization, the supplier. Let me finish my question. I'm sorry, your honor. Changes. It's a new conspiracy. All right. What I'm telling you, your honor, is that there were six or seven people that were identified in the testimony as being involved in this. Three of them were Ventura brothers. One of them, appellant is sure, has robbed them. Thereafter, he sees that all of the Venturas are now flashing money, have more stuff than they're supposed to have. And both Collado and Hippie Tavares says he saw this on its own. So you got one person that he doesn't trust. He's going to kill one of these brothers. He's not going to keep the other two brothers around. One of them was flashing a gun in the neighborhood and wearing a bulletproof vest. He's not going to keep them in the business. And I mean, the testimony is it was over. So I'm sorry, I'm getting a little passionate here. OK, that's fine. Why don't you move to your other points? Because, you know. All right. Well, point three is another challenge to the same convictions, 841 EA, but only with respect to the murder of Alex Ventura. Alex Ventura, there is no dispute that the brother that appellant wanted to kill was Hinton Ventura. Alex is the one, and Hinton was shot at one point. But because the brothers looked exactly alike, eventually it was Alex that was killed. Appellant believed that it was Hinton that actually robbed him or engineered the theft. But the testimony is that he lamented the death of Alex. So the concept of transferred intent, which has been recognized both by this court and the Supreme Court, would permit a properly instructed jury to transfer the intent to kill Hinton to the ultimate victim, who was his younger brother Alex. But the government never sought that charge in this case, and the court never gave it. And there is no way, I mean, the jury in this nullification context, go ahead. Mr. Eddie, transferred intent is when you're trying, your intent is to shoot someone, someone accidentally. The evidence was the gun was put to the head of Mr. Ventura. By Mr. Diaz, but that's not the person that appellant paid to kill. So there has to be. Why can't the jury conclude that your client wanted the person who stole the money dead? And if it was determined after that authorization that it was a different person who did that, that he intended that person to die. And actually the government points to the fact that he paid the money after the murder. You say he lamented the murder, but he paid them after the murder was done, which could show his intent that he, whoever was responsible, he wanted dead. Well, first of all, your honor, Hinton was actually shot in between. So the target that he sought to have killed was shot first of all, before the ultimate murders, which would certainly say that, you know, Hinton is the person that he's looking to kill and he got shot. So at that point, he ought, you know, this man has tried to kill him. He tells at the funeral, he tells Collado that he still wants Hinton to die. He feels terrible that his brother died. That was the reason why he, I mean, first of all, he's paying a hitman. You don't want to beat a hitman because the hitman may come for you. Second of all, he may still, you can't conclude from the fact that the money got paid, that he endorsed the mistake. He could have been paying for the murder to go on and for Hinton to still be murdered. So, I mean, the key here really, your honor, to me is that the jury can only follow instructions. It's undisputed that never wanted Alex to be killed. He wanted Hinton to be killed. So what I want to know, I mean, my argument here is that the jury needs a path through the instructions to get to the goal that the government wants. They were given no path in this case. They just can't jump out and convict him of anything. So was he charged on transferred intent? Then I agree that he could have been I have a minute reserved. So I'll, yes. All right. Thank you, Mr. Eddie. Okay. Mr. Donovan for Mr. Diaz. You're up, Mr. Donovan. Morning, your honor. My name is Jeremiah Donovan. I didn't try the case below. I was appointed on appeal for Diaz. I want to spend, I think, most of my time arguing about the juror misconduct. Doesn't take too long to tell the facts of the case. The juror began the deliberations about an for the day. A witness and the no factual dispute about what the witness saw. So a man and a woman juror walked in through the corridor. The man juror said to the woman juror, what do you think? The woman juror gave him kind of a funny look. The man said, well, what do you think? The witness didn't hear what was said next. Doesn't know whether the woman said something or the man said something. And then the man said, well, I'm glad he broke it down that way. I don't want to send a person to prison if he didn't do it. So I'm glad they are handling it that way. Those are the facts of the case. We asked that the judge excuse the male juror from the jury and inquire of the female juror as to whether any of that had any effect on her. And the judge declined to do that. And it seems to me that the judge and the government too, in discussing this issue, makes two errors. The first is that that conversation that the witness heard is the full sum of all the conversation between those two jurors. But that witness made clear he didn't hear the beginning of the conversation. She didn't follow the jurors out. As I say in my brief, we don't know whether when the jurors got to the courthouse it was like in 12 Angry Men where they say goodbye and they each go their separate ways, or whether they went off to a cafe or a bar in order to further discuss the case. The second thing that we want to know is what does it mean? What do those words mean? And it's fun to think about that. I'm sure the government thinks what it means as well. I'm glad the judge broke out elements of the offense because I don't want to send someone to prison who hasn't done it. I want to consider each element of the offense. I'm glad that the attorneys handled it that way. They argued in terms of the elements of the defense. Maybe that's what it means. But maybe what it means is I'm glad that that juror and our deliberations broke it down and showed us the evidence against each of the defendants because I don't want to send an innocent guy to jail. But boy, after I heard what he said, I can see we're not sending an innocent person to jail. And I'm glad all the rest of the jurors are handling it in that same way. What do you think? We don't know what it means. Well, Mr. Donovan, let me just ask you, let's put aside the issue of whether or not the juror should be questioned, but wouldn't you concede that there'd be no basis to dismiss? You said you requested the dismissal of the male juror based upon that, but you're saying it was an abuse of discretion not to dismiss a juror who said, I don't want to send a person to prison if he didn't do it. I mean, the juror's following his oath, right? What would be the basis for dismissing that juror without further inquiry? Well, I think maybe when they inquired, if the judge had granted our request to inquire of the woman juror, we might've found that a whole lot of other things were said. First of all, you didn't request, well, it's not you, but trial counsel didn't request that the male juror be questioned at all. There was no request to ask the male juror, what were you talking about? And I think, correct me if I'm wrong, I think what was asked in passing with respect to the female juror, it was not what was said, but just ask her, was anything that was said impact your ability to be fair and impartial? So there was no request of any inquiry as to what the details of the conversation were, which I think was probably a prudent thing under the circumstances. But Judge, I think, don't you think that a request to excuse a juror encompasses within it the idea that if I'm not, if you're sitting on the trial court again, right? You hear a request to excuse a juror, you say to yourself, well, that kind of encompasses requests that if I'm not going to excuse them on the basis of what I heard, but it encompasses a request that I call him. I mean, you can see the trial judge in this case spends a considerable amount of time explaining why he's not going to call the jurors. So I'm not sure that counsel- I don't agree with you on that. Just because you requested a juror be excused, that doesn't encompass necessarily that you want the juror to be questioned. We've said over and over again that questioning jurors can highlight something unnecessarily. It could impair a juror's ability to go forward. They could take what you're asking them the wrong way. It could destroy the deliberative process. There's a lot of downsides to questioning as opposed to deciding whether or not to dismiss or not. I want to talk about that in just a second, but place yourself in the position of defense counsel. Defense counsel says, we should excuse this juror and bring this woman in to find out if it had any effect on her. And then the trial judge says, I'm not bringing the plan. You guys haven't requested it, but I'm not bringing the people in for this reason, for this defense counsel. When the trial judge has indicated that he's made up his mind not to bring in the jurors, no matter what defense counsel says, it doesn't seem to me that there's any failure on the part of defense counsel to ask that they be brought in. And then with respect to what you just said about- because those concerns that your honor just expressed about influencing the jury's deliberations or learning about the course of their deliberations, I think that's a really important thing that trial judges should be really, really concerned about. But here, he's not bringing them in to ask them about what's happening during the deliberations. He's not inquiring about the deliberations. The questioning is, were the two of you out in the corridor yesterday? Did you leave together? Did you have a conversation? What did you say? He's not asking what happened during deliberations, but what did they say to each other outside the course of deliberations? So it seems to me that- That question could disclose- if you say, what were you talking about? That could disclose the details of the deliberative process. That would be a terrible question. I don't think the conversations that take place in the corridor against the express instructions of the trial judge without the other jurors being present is part of the deliberative process. Suppose one juror- all 12 of them are sitting around the table, and one juror says something in passing to a juror sitting next to them, and not all the other jurors hear it. That jurors violated the oaths? They should be dismissed. I mean, I don't think so, but I think the foreman, if it seemed significant, the foreman might say, what did you guys just- I don't think that's true. But I do think that it's- Suppose one juror goes out for a smoke break, and even though the jurors are supposed to stop, one juror says something in passing, we don't want to convict an innocent guy. That juror should be dismissed. These aren't- what I'm trying to point out to you, these aren't extra, you know, outside the jury influences. These are- But I think what you're saying, Judge, if those things happen, those things may happen. We don't know about that. That's one good reason to keep jury deliberations secret. Those things may happen. They do, they're violations of the case. If, you know, a year after the trial was over, one of the judges came forward and said that one of the jurors had whispered to the holdout jury, you know, this guy's got a long criminal record. I saw it on Google. Well, I think that that would be significant enough that it would be. I'm just suggesting, you know, deciding whether or not to question jurors and what cure for something that occurs like that. You have to consider the nature of what happened. The judge did give an- it's not like the judge did nothing. The judge gave an instruction emphasizing to the jurors that they- that, you know, I understood that this happened and there was some discussion and you shouldn't do that. So it's not like the judge didn't do anything. Judge, we're saying exactly the same thing. What I'm saying is the nature of what happened that is talking about the case in the corridor doesn't go right to the heart of the deliberations. I have two minutes that we can- Yes, thank you. I can talk to you further about this later. Yes, thank you very much. And for the government, we have Mr. Ciacciolo. I hope I got that right. Yes, good afternoon or good afternoon, your honors. May it please the court. My name is Nicholas Ciacciolo. I'm an assistant United States attorney in the Southern District of New York. I represent the United States on the subpoena as I did in the proceedings below. I'd like to start by responding to some of the points made about alleged juror misconduct. The district court did not abuse its considerable discretion here in declining to dismiss two jurors for alleged misconduct. First, it is not even clear that the alleged incident constituted misconduct. And second, even assuming the one juror's alleged statement rose to the level of misconduct, Judge Castell's response fell comfortably within his considerable or broad statement. And that goes to whether or not the jurors at issues were deliberating. That's far from clear, whether they were deliberating in the corridor of 500 Pearl. As this court has repeatedly recognized, not every comment a juror may make to one another about a case is discussion of the defendant's guilt or innocence that comes within a common sense definition of deliberations. Here, the two statements at issue, so what do you think? And in substance, I'm glad he's handling it that way. I don't want to send an innocent person to jail. I do not necessarily reflect discussion of the defendant's guilt or innocence. In fact, they reflect the juror's commitment to their oaths and the presumptions of innocence. But even if we were to take the view that that constituted deliberations, Judge Castell did exactly what this court has asked district courts to do in such situations. First, he investigated the claim. Judge Castell called in the witness and questioned the witness who overheard these alleged statements. After hearing from that witness and questioning that witness, Judge Castell called in the full jury, gave a curative instruction, said he was aware of the incident and said it was not to happen again and that they are not to discuss it. And then Judge Castell explained why he was not going to question any of the jurors, even though none of, as Judge Bianco correctly points out, that none of the parties requested that any of the jurors be questioned. Judge Castell, nonetheless, set a record as to why he was not going to question the jurors. And Judge Bianco pointed out some of the reasons why this court has repeatedly emphasized that that's very dangerous ground to question a juror. There was one request. It was a passing request, though, to question, as Mr. Donovan noted, the female juror, just to ask whether anything that was said affected her ability to be fair and impartial, right? Correct. And Judge Castell explained why he was not going to call any of the jurors in because it's dangerous ground. You never know what you're going to hear. In fact, if you go to the portion of the transcript where Judge Castell gives the curative instruction, he starts giving the curative instruction and then a jurist just blurts something out about what happened that morning and when they were starting to deliberate, which just exemplifies how dangerous it is and how tricky a situation is about possibly questioning a juror. As to whether Judge Castell abused his discretion by not questioning the jurors, even just the question that was posed by Diaz's counsel of did that conversation affect your ability to remain impartial, this court has recognized that within the district court's discretion is the decision whether or not to question jurors to determine more about misconduct, and that's United States versus Siegel. I would note that one of the cases that the defense relies on heavily, United States versus Haines, which was a remand for failure to investigate, the failure to investigate there was the failure to call in the witness who overheard the alleged statement, not to question the jury. It was the failure to call in the witness who overheard the statement. Judge Castell did that in this case. He called in the witness and questioned the witness who overheard the statement, and I'd also note this, the alleged statement that was overheard in Haines was much different than the statement here. In Haines, the jurors were essentially questioning the presumption of innocence. In substance, if they're on trial, they must be guilty. So in light of these facts, it cannot be said that Judge Castell abused his broad flexibility. I'd like to turn to, just quickly, to the two points raised by Mr. Acosta's counsel that go to the sufficiency of the evidence here, and starting with the ongoing narcotics conspiracy, and Judge Bianco was correct in pointing out the considerable evidence in the record that showed that the Carlos Tavares, who was a bagger or scaler, he weighed and bagged drugs for Mr. Acosta, who testified that he was working the night of the murders, returned to work after the murders, and continued working at that 149th Street drug location that was indisputed at trial was Mr. Acosta's drug location. There's no evidence whatsoever in the record that there's a new conspiracy that someone else takes over that drug location. Mr. Acosta completely ignores the evidence of Mr. Collado, who says he began working for Mr. Acosta's drug organization after the murders, and Mr. Collado testified that he was working at the 149th Street location, the same location that the workers and the victims worked at prior to the murders, at transcript 556 through 558, and there was also evidence of other individuals who worked for Mr. Acosta both before and after the murders. Now, Mr. Acosta hangs his hat on the testimony of Hinton Ventura, who testified that Mr. Acosta abandoned the 149th Street location after the murders, but as Mr. Ventura also testified, after Mr. Ventura was shot at, he left. He wasn't around anymore. He stayed away from the drug location, and that testimony was corroborated by Mr. Tavares. Mr. Tavares testified, referring to Hinton Ventura, quote, he disappeared. He never went back to the block. I never saw him again. So Mr. Ventura, Hinton Ventura, who testified about Mr. Acosta abandoning the drug location, simply was not in a position to observe the full extent of Acosta's drug organization following the murders. The judge correctly charged the jury here on the requirement that it was an ongoing narcotics conspiracy, and the jury was free to pick among competing inferences, and drawing the, doing the record most favorable to the government as the court is required to do. It's not the case that no rational juror could find that Acosta, or there was more than sufficient evidence for a rational juror to find that Acosta was engaged in our ongoing narcotics conspiracy. And then quickly, just turning to intent to kill, this is not a case of an accidental or mistaken killing. This was cold-blooded murder. Mr. Diaz held the gun to the victim's head, said bye-bye, and shot him from point-blank range. The identity of the victim is not an element of the offense here. It's not an element of 848E. It just requires an intentional killing in furtherance of a narcotics conspiracy. Mr. Acosta does not dispute that there was an intentional killing by Mr. Diaz, and there was sufficient evidence in the record for the juror to find that Mr. Acosta counseled, commanded, induced, or procured that killing, and at the very least, aided and abetted that killing. And I would also note to Judge Bianco's point, there was also evidence in the record for the jury to infer that the plans changed. Remember, there's evidence in the record that after Hinton Ventura is shot at on Thanksgiving, Collado, the individual who set up the murders or facilitated the murders, approached both Diaz and Acosta, and they said, keep your mouth shut. The plans have changed. So there was evidence in the record that a juror could infer that Mr. Acosta found out who was responsible for the murders and had wanted them killed. And of course, as Judge Bianco pointed out, when Alex Ventura is shot, Mr. Acosta doesn't say, how could you do that? That's the wrong person. He pays Mr. Diaz for the murders. So there was more than sufficient evidence here for the jury to find out that this was an intentional killing. Unless there are other questions by the court, the government would rest on its submission here. Okay, thank you very much. Mr. Eddy, you have one minute. Very quickly with respect to Tavares. What I think happened there was that, I mean, Hinton, according to Tavares, Hinton disappeared right after the burglary. So there's a reason, perhaps after he gets shot at, for him to disappear forever. But Tavares said that Hinton was gone from the burglary thereafter. Also, when Tavares was working for my client, supposedly, he worked upstairs in an apartment. At the time of the murders, he's standing on the street selling drugs himself. I think the inference that can be drawn is, these guys owned that block. That's where they grew up. And whether or not Appellate was involved, and he was their source, they were still trying to hold down the block for themselves. In fact, the two victims, on the night they got killed, walked away from the block against Tavares's, or over his protestations, and went off and got, they didn't care about working. They already had the money they stole. They had no reason to stand out on the street and sell drugs and risk getting arrest. They each had $100,000. Now, to just very briefly piggyback on Mr. Donovan's point, with respect to the standard of view, where the trial judge neglected to make any inquiry whatsoever, and the defendant's Sixth Amendment rights are replicated, we believe that the review should not be of, or should not be abuse of discretion, but should be de novo. The law here, according to Haynes and this court, faced with a credible allegation of juror misconduct during the trial, a court has an obligation, independent of any request from defense counsel, to investigate and, if necessary, correct the problem. Court didn't do that here, okay? And if you want to But I think your honors are aware that Judge Castell commands a courtroom. He said what he was going to do. He broke no talkback. So, you know, they didn't have, they didn't have a chance to have a fallback position. So he had a duty to investigate and didn't do so. All right, thank you very much, Mr. Eddy. Mr. Donovan, you have two minutes for rebuttal. Turn on your mic, Mr. Donovan. There you go. May it please the court, my argument might be better if my mic isn't on. If we could, Judge Bianco, if we can continue the session. Listen to what the government says. Now, I'm not, I'm not going to, I'll promise my brother, Brother Cicciolo, I'm not going to go back and tell the district court what he said, but he seriously underestimates the ability of this kind of inquiry. I mean, this is not that hard to do. District judges do it all the time without unduly probing into, into, into, into jury deliberations. And I think this district court just could easily have conducted the kind of inquiry, at least a preliminary inquiry. How long did they talk? What else did they say without, without endangering jury deliberations? I think also the government falls... Wait a sec, he did, wait a sec, he did inquire the witness that he did, but don't forget that witness. No, he made a quick, excuse me, excuse me. So he made an error of law by not going further. That, is that it? Mr. Eddy proposes an error of law. Do you embrace that? Well, I'll, I'll, I'll take Mr. Eddy's position, but I also say he should have, remember that witness, she only heard three lines. She didn't know when the conversation began. She didn't follow them. That's not the complete conversation that they had. So, yes, I fault the district judge for not calling in it. So your rule is, your rule is, is that any time that anyone hears a juror talking about something and they say something that, that might in any way be connected to the trial, that there's a duty as a matter of law to inquire of the jurors. Is that true? That's that, I think, Judge, I think that's too strong. I mean... Well, then tell me what your rule is, because that's what you want. My rule is... You just said you embrace. So give me the rule that you want in the signed opinion from this court. So if a preliminary, here's the rule I want. If a preliminary showing is made that the jurors have disregarded a judge's instructions not to discuss the case outside of the presence of the other jurors, the judge is required to conduct an inquiry that involves the calling of the, of the jurors in order to determine whether that in fact has happened. Even in the presence of, one of the defense counsels specifically requesting that one of the jurors not be questioned? Nobody requests they not be questioned. Oh, no, you didn't ask, no, you didn't ask with regard to the male juror. You wanted the female juror questioned. You did not want the male juror questioned, did you? That's too strong, Judge. It wasn't that they didn't want it. They didn't, they didn't ask. They wanted that, they wanted the, they wanted the male juror, they wanted him thrown off. They said, throw this guy off. Okay. I mean, that's a much stronger. But you didn't want to hear from him. You wanted, you wanted to throw off. Now wait just a second. Now you're, you're making your argument and I'm testing the, I'm testing the bounds of it now. So you asked for a rule that says you've got to inquire the juror, but now all of a sudden, is there a little vacillation here? Because if, if counsel doesn't want to inquire the juror, but wants to inquire the other juror, the judge errs as a matter of law. Is that it? Well, I do vacillate from time to time, but yeah, I mean, if you apply my rule, I think you got to bring them both in. Yeah. But, but Judge, will you say, I want this, will you say, I want, I want this juror thrown off the jury. So don't bring them in, don't question, just throw them off the jury. The other one, bring her in. I, you know, as I said, as I said to you, I think that kind of thing. You want the juror thrown off who says, I'm not here, I'm glad they said this because I don't, I don't want to send anybody to jail who's innocent. That's the juror you want to get rid of. Well, what's the next time you're sitting in front of 12 people? Judge, what, but, but, but I wasn't trial counsel, so I didn't ask that he be thrown off, but you don't know what the but is. You don't know what the but is, Judge. If it's like, I don't want, I don't want a guy thrown into jail because, because he's innocent, but I'm never going to allow any bug dealer to be, to be, I don't know what the evidence is, I'm not going to throw any drug, if there's a but, you know, that, that's important. Anyway, thank you. Thank you very much. Thanks to all of you and we'll reserve decision. Thank you very much. The next.